## JENSEN v. UNITED STATES et al.
### No. 416.

District Court, D. Maine, S. D.

July 27, 1948.

Sidney Wernick, of Portland, Me., for plaintiff.

Alton Lessard, U. S. Atty., of Lewiston, Me., and Edward Harrigan, Asst. U. S. Atty. of Portland, Me., for the goverment.

Charles Pomeroy, of Portland, Me., for Hazel K. Brackett.

Henry Cleaves Sullivan, of Portland, Me., for Edelbert W. Brackett.

CLIFFORD, District Judge.

In this action the plaintiff seeks, as named beneficiary, standing in loco parentis, to recover on a policy of life insurance, issued under the National Service Life Insurance Act of 1940, 38 U.S.C.A. § 801 et seq., on the life of Milton A. Brackett. The case was heard by the Court without a jury.

The plaintiff brought her action against the United States, praying that she be awarded the insurance proceeds by the Veterans' Administration. The United States thereupon moved that the natural parents of the insured be joined as additional parties defendant, since it wished to avoid multiplicity of litigation and possible double liability in paying any claims.

In March, 1944, an award was approved by the Veterans' Administration authoriz-

ing payment of the insurance to Mrs. Jensen as foster mother of the insured. Four months later, on July 14, 1944, payment of the insurance was suspended because of a protest made to the Veterans' Administration by the natural mother of the insured, Hazel K. Brackett, who made the claim that Mrs. Jensen did not stand in loco parentis to the insured.

On July 29, 1946, plaintiff was notified by the Veterans' Administration that it had made a determination to the effect that she did not stand in the relationship of parent, as defined in the National Service Life Insurance Act of 1940, as amended by the Act of July 11, 1942, to the veteran, Milton A. Brackett, and that, therefore, her claim for insurance had been disallowed by the Veterans' Administration on March 25, 1946.

The defendant, Hazel K. Brackett, was notified by the Veterans' Administration that her claim was allowed on the ground that she was the natural mother of the insured, Milton A. Brackett. The existence or whereabouts of the natural father, Edelbert W. Brackett, were unknown to the Veterans' Administration at that time.

The only issue presented is whether plaintiff stood in loco parentis to the insured at any time prior to entry into active military service for a period of not less than one year. If such relationship is established, then she is entitled to recover. If she fails to establish this fact the defendants, the natural parents of the insured are entitled to the insurance benefits.

The Court finds the following facts from the evidence:

Milton A. Brackett, the insured, was born on April 17, 1920. He was graduated from high school in June of 1939. He entered the armed forces of the United States as a soldier on February 24, 1941. While in such military service, on May 1, 1943, he applied for and was granted a National Service Life Insurance Policy in the principal sum of $10,000. He died while in service on October 2, 1943, in the line of duty, and on this date the insurance contract was in full force and effect. In his application for the insurance, the insured designated the plaintiff, who was not related to him, either by blood or marriage, as the beneficiary, her relation to him being described as loco parentis.

The plaintiff, Inez M. Jensen, was born on October 27, 1903. She was a married woman, living with her husband, and the mother of two minor daughters, during the period in which the events herein related took place.

The natural parents of the insured, Edelbert W. Brackett, father, and Hazel K. Brackett, mother, were both living at the time of the death of their son, the insured, on October 2, 1943.

The parents of the insured had separated and have never lived together as husband and wife from the year 1926, up to the date of this trial.

On May 20, 1926, the insured, then six years of age, together with four other minor children of Edelbert W. and Hazel K. Brackett, father and mother of the insured, were committed to the custody of the Maine State Department of Health and Welfare, then known as the State Department of Children's Guardian. The father, for over a period of seventeen years, contributed only $30 toward the support of his family. The insured did not visit and never saw his father from that date to the date of his death, or for a period of over seventeen years. He saw his mother on one occasion in 1930, and again in the early summer of 1942, while on furlough from the army camp where he was stationed.

The insured lived in various places, with different families, and his support and maintenance was paid for by the State of Maine from 1926 until sometime late in 1939 when "he went on his own." He was not skilled in any trade and worked as a common laborer. Shortly after his graduation from high school, he went to Quoddy, at Eastport, Maine, to participate in one of the projects of the National Youth Administration, which was in operation there. He remained at Quoddy until a short time prior to Thanksgiving, in November of 1939, when he returned to Scarboro, Maine. While at Quoddy he wrote to some of his former class mates but did not receive any reply to his letters. He wrote to Shirley Mills, daughter of the plaintiff, who was

then about fourteen years of age, and a freshman in the same high school that he attended while a senior, requesting her to write to him. At the suggestion of Mrs. Jensen, plaintiff, mother of Shirley, she complied with his request and during the summer of 1939 wrote him occasionally, giving such news as she and her mother felt would be of interest to the insured. During 1938 and 1939, the plaintiff, Mrs. Jensen, had heard much about Milton Brackett, the insured, from her daughter, Shirley, who told her that he was a ward of the state, was unable to take part in the social activities of the school for financial reasons, and appeared to be a lonely and discouraged boy of good habits and high character.

The plaintiff, who was moved by sympathy, invited him to her home on the day before Thanksgiving, 1939, where he enjoyed the Thanksgiving dinner with the family. He then returned to Quoddy where he remained until about the eighth day of December, 1939. He then returned to Scarboro, the town in which both the plaintiff and the insured resided, and went to live at the home of the Winship family at the invitation of one of his friends who was a member of this family. He worked around their farm for his board and room. He visited the home of the plaintiff every evening and occasionally in the day time during the remainder of the month of December. He was cordially received by the Jensen family, frequently had his supper at their home, and was given car fare and lunch money occasionally to be used by him when he went to the nearby City of Portland, Maine, for the purpose of obtaining employment. He enjoyed his Christmas dinner with the plaintiff and her family. They exchanged Christmas gifts and he continued his visits to the plaintiff's home. Shortly after the first of January, 1940, he stated to Mrs. Jensen that he intended to leave Scarboro and go to California to seek employment. She advised against his leaving for California and he complied with her request.

The plaintiff and her husband had two daughters, but no son of their own. They had discussed the idea of having the insured come and live with them as their son because, to use the words of the plaintiff:

"We had come to think as much of him as we could if he were our own son. * * * We would do everything we could for him and would use him just the same as we would the other children, and that he would have the same privileges as they enjoyed."

On the evening of January 4, 1940, the plaintiff, her husband, her daughter Shirley, and Milton Brackett, the insured, were present at the plaintiff's home in Scarboro. It appeared to the plaintiff and her husband that the time was opportune to discuss with Milton the proposal that he come and live with them as their son. Plaintiff testified:

"During the time we had known him, we had come to think a great deal of him, and I told him that he fitted in with no trouble. I used him just as I did one of the family and he liked it, and I told him all this, and I told him how we always wanted a boy and felt that if he cared to come that he really was the boy for us, and my husband said: 'Yes, Milton, regardless of whether you have any job or any money or anything, we would really like to have you feel that this is your home, and that you have all the privileges, and we will do for you just the same as we would for our own, because we have come to feel that way about you.'"

The plaintiff testified further:

"We had decided we would like very much to have him come and live with us, as our son, and that we would do everything we could for him, and use him just the same as we would the other children, and he would have the same privileges, and I told him how very much we cared for him. My husband spoke up. He was the one that mentioned the fact that regardless of whether he worked or had any money or not, he wanted him to feel that it was his home and that whatever we had we would share alike. I brought it up that we didn't have great wealth, but we always had a home. We occupied it jointly with my people and we had enough to eat. We were always warm, and we were very glad to share it with him what we had."

Plaintiff also testified:

"Milton was very much upset, because as I said, he was very sensitive, very proud, and he knew from association with us that he was a part of the family, and we were really offering him everything we had, and he went into the pantry in the little kitchen and he closed the door, because he had to be by himself. We felt so bad we all cried, too. Well, anyway, very shortly he came back and the first words I will always remember, because my husband had spoken to him last, and he said, 'Thanks, Pop' and, then, of course, we talked on and he was awfully pleased. My husband took him in the truck to get his things at Winship's. He had very little but he brought what he had, and we fixed up a little room for him."

This room was maintained and used by the insured from the night of January 4, 1940, until he was inducted into the United States army on February 24, 1941. It continued to be maintained and was known in the family as "Milton's room" and was not occupied by anyone, except an occasional overnight guest, until his death in October, 1943.

In the latter part of January 1940, he left Scarboro to work at St. Albans, Vermont, as a laborer for the Vermont Central Railroad. After working several weeks, he was laid off and he returned to Scarboro, and continued to live with the plaintiff and her family in their home. He was outfitted with heavy clothing and other necessities by the plaintiff and her husband, for which they paid. Small sums of money were given to him, and later in the winter of 1940, he returned to St. Albans, Vermont, to work, and on almost every weekend he came back to Scarboro, to his home with the Jensen family. On various occasions, notwithstanding the fact that he was earning wages, small sums of money were given to him and other items of clothing were purchased by the Jensens for him. It was also understood that if there were anything he would like to have or anything that they could do for him, they would be glad to do it and they urged him to ask for anything he needed "because all the children asked their folks for anything they wanted." They gave him to understand that whatever was necessary would be provided by them.

Among the correspondence are two Mothers' Day messages to the plaintiff, expressions of concern over the health of his "Dad," acknowledgments of reproving statements by his "Mom," statements of gratitude for their having sent delicacies, and repeated affirmations of his good fortune in having such "wonderful folks."

Of noteworthy significance are two letters in which Milton referred to his natural mother. In a letter dated, March 28, 1942, is found the following:

"Well, Mom, you can't imagine who I received a letter from today. After seventeen years, I have received a letter from Mrs. Hazel K. Brackett (my mother). One of my sisters died the other day, but I can't feel bad because I never saw her. I suppose I should be overjoyed at finding out where my whole family is, but somehow it doesn't affect me that way. Lots of love, your son, Milton."

And in a letter dated May 21, 1942:

"You are my mother even though I have found my other mother. You still are my own Mom and always be. I told her (meaning his natural mother, Hazel K. Brackett) all about you, and she thinks you are awfully nice. I think she knows that I have adopted you as my real mother."

This feeling of deep affection for Mr. and Mrs. Jensen, by the insured, is borne out by a letter, dated March 8, 1944, after his death, from Mrs. Hazel K. Brackett to the plaintiff in which Mrs. Brackett mentions that the plaintiff, Mrs. Jensen, had been as a mother to Milton and thanks her for being so good to him. Mrs. Brackett testified on the stand that her information about Mrs. Jensen's good care of Milton came from Milton himself.

On February 24, 1941, he was inducted into the army of the United States. During the training period in the army from 1941 until he left for overseas in October of 1942, he wrote a number of letters to Mrs. Jensen and an occasional letter to her daughter, Shirley, and two letters to Mr. Jensen. Twenty of these letters, addressed to the plaintiff, were couched in affectionate terms and substantially all commenced with the salutation, "Dear Mom" and ended "From your son, with

978

lots of love," signed, "Milton." The two letters written to Mr. Andrew F. Jensen, husband of the plaintiff, were begun with the salutation, "Dear Dad" and ended with the words, "Your son, Milt." All of these letters were admitted as exhibits without objection.

Four witnesses were called by the plaintiff, each of whom corroborated the testimony of Mrs. Jensen to the effect that the insured continuously made his home at Mrs. Jensen's; that he referred to Mr. and Mrs. Jensen as "mom" and "pop"; that he referred to the Jensen's home as his home; that he came there nearly every weekend during the entire year of 1940, while he was working in St. Albans, Vermont; that, while on furlough after entering the army on February 24, 1941, he spent the entire time at the Jensen's home; that he referred to the father and mother of Mrs. Jensen as "grandma" and "grandpa"; that he never referred to either the Jensens, or the father and mother of Mrs. Jensen, in such intimate fashion, prior to the time he entered their home, as a son, early in January 1940.

The defense called three witnesses, including Hazel K. Brackett, natural mother of the insured. Their testimony was in no way in contradiction to the testimony given by Mrs. Jensen and her witnesses.

Evidence brought out by the defense showed that the insured and Shirley Mills, daughter of the plaintiff, Mrs. Jensen, became engaged to marry in August 1942, or two and one-half years after the insured came to live at the Jensen home.

The evidence indicates that plaintiff's daughter, Shirley, led the normal and usual life of a young and carefully reared American girl, and that she did receive the casual attention of young men of her own age, from her high school days until sometime early in 1942. During this same period of time, the insured manifested a marked interest in different girls, whom he met while in the service. It wasn't until early in 1942, that he became serious in his intentions toward Mrs. Jensen's daughter.

The evidence does not sustain the contention of the defendants, that the letters from the insured to Mrs. Jensen could be construed as those coming from a prospective son-in-law to the parents of his intended bride.

At the time that the contract of insurance was entered into, and at the time of his death, the natural parents of the insured were still living, but the care and custody of the insured had been as stated, taken from them by the state in 1926. Although the insured was still a ward of the state until January 16, 1941, the state did not pay for his support and maintenance after November 1939.

### Conclusions of Law.

Counsel for the plaintiff relies upon the law as stated in Niewiadomski v. United States, 159 F.2d 683, and in Strauss v. United States, 2 Cir., 160 F.2d 1017, and this Court accepts that view of the law as correct.

The Court states in the Niewiadomski case, 159 F.2d at page 686:

"The term 'in loco parentis,' according to its generally accepted common law meaning, refers to a person who has put himself in the situation of a lawful parent by assuming the obligations incident to the parental relation without going through the formalities necessary to legal adoption. It embodies the two ideas of assuming the parental status and discharging the parental duties." " * * * Due to the obligations and rights that arise out of such a relationship, the assumption of the relationship does not arise by chance, but is the result of intention."

On the same page the Court states:

"At common law a parent is charged with the duty of educating and supporting a minor child, and with a continuing obligation thereafter in certain cases of physical and mental disability. A parent has the right to the custody and control of a minor child together with the authority to take such disciplinary measures as are reasonably necessary to discharge the parental duty. A parent who is providing a home for his minor son and supporting him is entitled to his services and earnings. The same rights and duties exist when the relationship of in loco parentis has been intentionally assumed and established."

The National Service Life Insurance Act, 38 U.S.C.A. § 802(g), provides that:

"The insurance shall be payable only to a widow, widower, child * * * parent, brother or sister of the insured. The insured shall have the right to designate the beneficiary or beneficiaries of the insurance, but only within the classes herein provided * * *."

Section 801(f) of the same Act defines "parent" as follows:

"The terms 'parent,' 'father,' and 'mother' include a father, mother, father through adoption, mother through adoption, persons who have stood in loco parentis to a member of the military or naval forces at any time prior to entry into active service for a period of not less than one year."

The Court concludes that the plaintiff, Inez Jensen, stood in loco parentis to the soldier prior to his entry into active military service for a period of not less than one year.

Judgment shall be rendered for the plaintiff without costs.